Mary Florence SMAIL (Benson),
Plaintiff-Appellee,

v.

Edwin H. SMAIL and Cameron Smail, Co-Executors under the Will of Edwin W. Smail, and, First National Bank of Sullivan County, Trustee of Trust A and Trust B under the Will of Edwin W. Smail, and Edwin H. Smail and Cameron Smail, individually and as representatives of the class of the beneficiaries of Trust B under the Last Will and Testament of Edwin W. Smail, Defendants-Appellants.

Supreme Court of Tennessee,
at Knoxville.

May 26, 1981.

David S. Haynes, and Myers N. Massengill, Bristol, for plaintiff-appellee.

T. Arthur Scott, Jr., and Edwin L. Treadway, Kingsport, for defendants-appellants Executors of Counsel, Hunter, Smith & Davis.

Jackson C. Raulston, Kingsport, for defendants-appellants Beneficiaries.

Charles C. Gore, Bristol, for defendant-appellant First Nat. Bank of Sullivan County.

OPINION

HARBISON, Chief Justice.

This case involves a controversy between the beneficiary of a marital trust and the executors of her deceased husband's will. The executors are sons of the testator and are also primary beneficiaries of the non-marital trust. As the case comes to this Court, the dispute centers primarily around the time and the method of funding these trusts.

At the time of his death testator was one of nine directors of the Indiana Telephone Corporation, a closely held corporation whose stock was traded over the counter. He held some 6123 shares of voting stock which was valued at thirty-five dollars per share by the executors on both the federal and the state death tax returns.

Apparently the value of the stock remained unchanged for some ninety days after the death of testator. However, for some time prior to his death he had been active, along with others, in promoting a merger of the corporation with another company which, when consummated, would significantly increase the value of the stock. Several months after his death, news of the merger became public and the price of the stock increased markedly.

The principal contention of the plaintiff, testator's surviving widow, is that she is entitled to share in the appreciation of this stock occurring after the testator's death. She insists that the marital trust must be funded with at least fifty percent of the shares owned by testator, valued at the date of his death. In addition, because of

language in the trust relating to the payment of income to her, she insists that the executors were required to fund the marital trust as of the date of death and, in all events, no later than ninety days thereafter.

The executors have resisted these claims primarily because the bequest to the marital trust was expressed in terms of a pecuniary formula, or amount, rather than a fractional share of the residue, and assets distributed to satisfy that formula were to be valued on their respective dates of distribution, not on date of death. While they concede that the widow is entitled to have her share of the trust income computed from date of death, they deny that the will required actual funding at that time or within ninety days. We sustain the position of the executors as to both contentions.

Although the will is not ambiguous, there are some background facts which might reflect some of the reasons why it was drafted as it was. The testator and the present plaintiff were married on June 26, 1976, the date on which the will was executed. This was slightly more than one year prior to the date of his death on July 1, 1977. Testator and plaintiff had each previously been married. The testator had grown sons by his first marriage, both of whom were in university or graduate school on the date of the execution of the will. A reading of the will makes it rather plain that the welfare of these sons and their families was important to the testator. He made them primary beneficiaries of the estate, as well as the executors. He was an experienced businessman, knowledgeable of and concerned with minimizing death taxes. In our opinion, his bequest to his widow was designed to give her the maximum amount which would qualify for the federal estate tax marital deduction, but not anything more. This is borne out by the fact that on June 17, 1976, nine days prior to the execution of the will, the testator and the plaintiff executed an antenuptial agreement in which each expressly released the other from any claim against the estate of the other resulting from their contemplated marriage. Each of the parties had separate estates. Assets belonging to testator on the date of the agreement were estimated at about $704,500, plus life insurance in the face amount of $219,000, together with a contingent one-half interest in a trust created by his first wife, whose estate he was in process of administering. He listed only $24,500 in miscellaneous liabilities. Plaintiff listed assets of $248,500 in addition to life insurance in the face amount of $20,000. She had been married for twenty-three years to Dr. Ellis Harr, who died in 1974. She had four children by that marriage, ranging in age from nineteen to twenty-seven years.

■ The will in question was obviously written by an attorney familiar with estate planning. It utilized standard language and tested formulas commonly used to qualify assets for the marital deduction and at the same time to give executors maximum discretion in the administration of an estate. The first item of the will directed the executors to pay funeral and administration expenses out of the general estate. They were then directed to pay all death taxes out of the residue. The second item gave to the sons of the testator—not the widow—all of his clothing, jewelry, personal effects, automobiles and household goods.

In the third item of the will the testator created a marital trust for the benefit of the plaintiff in the event of her survival. This will left to the trustee "a pecuniary amount" equal to fifty percent of the value of the adjusted gross estate as finally determined for federal estate tax purposes, less any assets which might have passed to her other than under the terms of the will. The executors were expressly authorized to select and to distribute to the trustee cash, securities or other property, including real estate, to constitute the trust. Most importantly, they were directed to employ for that purpose "values current at the time or times of distribution." Estate tax values were deliberately and expressly not to be used, nor were any assets to be included which did not qualify for the marital deduction.

In Item 7 of the will the two sons of the testator were made co-executors. They were given extremely broad powers, as follows:

"I give my Executors full power and authority to sell all or any part of my real or personal estate at public or private sale at such time or times and upon such terms as my Executors deem best; to execute leases; to borrow money and pledge the assets of the estate to secure the repayment thereof; to invest and reinvest; to hold securities in the name of a nominee; to settle any claim either in favor of or against my estate; and to execute and deliver all proper and necessary conveyances and other instruments of transfer. The powers and authorities given to my Executors may be exercised without order of court. I direct that the receipt of my Executors for the proceeds of any property sold shall be a full discharge to the person paying the same."

Broader and more sweeping powers to the executors to fund the trust in whatever way they deemed appropriate could hardly be expressed. The testator had not left to the marital trust a fractional share of the residue of his estate or any other specific assets. He had left a pecuniary sum—an amount which, after being computed in accordance with the federal estate tax proceedings, could be satisfied wholly in cash, wholly in kind, or partly in both. The situation is no different from that which would obtain had the testator left the sum of $500,000, or some other exact pecuniary bequest, to the marital trust. The executors were given authority to sell any assets in the estate for purposes of administration. To this end, in our opinion, they could have sold, or could now sell, portions of the shares of stock now in controversy or other assets out of the estate and pay a sum of

money to the marital trust, contingent only upon the final tax computations as to the amount.[1] To say that the widow should be given the benefit of "appreciation" in any particular stock or other asset on equitable principles, in our opinion, flies in the face of the will and is contrary to the testamentary scheme employed.

There is a long and familiar history behind the formula which was used in this case. It is well-known to estate planners. The marital deduction came into the federal estate tax statutes in 1948, and prior to 1964 two types of "formulas" were common, one of these being a pecuniary bequest and the other a "fractional share of the residue." In 1964, however, the Internal Revenue Service promulgated its "Revenue Procedure 64–19," which imperiled the use of the pecuniary bequest where executors were required to use estate tax values in the funding of marital trusts. That type of formula had become quite popular, because it allowed for post-mortem estate tax planning, particularly in cases where the widow had a separate estate of her own. The Internal Revenue Service, however, by the Revenue Procedure mentioned above, disqualified many marital trusts and disallowed the marital deduction unless the executors were required by the will or by state law to select assets fairly representative of the estate in the funding of the marital trust. To this end, many states, including Tennessee, enacted specific statutes to deal with the problem. This is the background of T.C.A. § 30–1317, requiring executors, "unless the governing instrument provides otherwise" to distribute assets, including cash, fairly representative of appreciation or depreciation in the value of all property thus available for distribution in satisfaction of such pecuniary bequest, devise or transfer.[2]

1. According to the initial tax returns in the record, the testator had $226,000 worth of life insurance specifically payable to the trustee under this will. He possessed interests in land worth $295,260. He owned shares of twelve different stocks, together with stock options and bonds, totalling $611,751, not including the

"appreciation" contended for by the widow in this case.

2. See R. W. Knolton, *The Marital Deduction— Effect of Revenue Procedure 64–19*, 33 Tenn.L. Rev. 493, 502 (1966); *see generally* A. N. Polasky, *Marital Deduction Formula Clauses in Estate Planning—Estate and Income Tax Considerations*, 63 Mich.L.Rev. 809 (1965).

To avoid the Internal Revenue Procedure above referred to and statutes like T.C.A. § 30–1317, many estate tax planners recommended the use of a pecuniary bequest with distribution to be based, and the marital trust to be funded, not upon values as determined in estate tax proceedings, but upon those obtaining at date of distribution.[3] In that way the widow was protected from any depreciation in assets which might be distributed to her, so that there was no possibility of executors defeating or minimizing the marital bequest by the use of depreciated assets. At the same time, values at date of distribution guaranteed that the marital trust would receive the exact amount specified by the testator, but no more—in other words, post-death "appreciation" of assets would not inure to the benefit of the marital trust and was not intended to do so.[4]

The choice of language in the present will is not, in our opinion, inadvertent, nor was it employed without careful consideration of the consequences. This was a case, like many others, where the widow was not the sole or necessarily even the principal beneficiary of the testator's bounty. She had a sufficient separate estate. She had relinquished any claim upon that of the testator. The testator was, however, concerned with minimizing estate taxes and with facilitating the task of his executors in administering the estate. He chose a formula tailored specifically to accomplish those purposes, a formula in wide use by that portion of the bar engaged in specialized estate practice. One author, commenting upon a formula

identical to that involved here, where date of distribution values were to be utilized, said:

"The principal point of this type of a marital deduction clause is that it does provide for a pecuniary formula (dollar amount determined under a formula), as distinguished from a fractional share; but the bequest is to be satisfied with assets valued at the distribution date. It is this latter requirement which particularly takes this clause out of the adverse rule provided under Rev.Proc. 64–19.

"In the application of this particular pecuniary formula clause, the widow is entitled to a fixed dollar amount and increases or losses in value are shifted to other beneficiaries. This clause does have the disadvantage that capital gains may result upon the satisfaction of the dollar bequest with appreciated assets; but on the other hand capital losses could also result.

"A principal advantage of this form of marital deduction clause is that it does permit flexibility in the selection of assets by the fiduciary. By the same token it requires evaluation of assets at the time of distribution. While this generally has not been a tax problem in the past, the publication of Rev.Proc. 64–19 may cause the Service Personnel to scrutinize the values used more closely for gift tax possibilities.

"This pecuniary formula marital deduction clause illustrates, as does the prior fractional share clause, that different consequences flow with respect to the

---

3. Revenue Procedure 64–19 specifies that it is not applicable where assets selected by the fiduciary to be distributed in kind are required to be valued at their respective values on the date, or dates, of their distribution. Rev.Proc. 64–19, § 4.01(c).

4. See R. L. McMurray, *Some Whys and Wherefores of Will Drafting—Revised*, 15 Tenn.Bar Jour. 2, 31 (1979). The author, in a model will, recommends use of date of distribution values, with this caution:

"The valuation date of this clause should be scrutinized carefully before being accepted. Its advantage is that it eliminates the problems of Rev.Proc. 64–19 and T.C.A. 30–

1317, which require the executor to be fair in allocating assets to the marital trust which have both decreased and increased in value between the date of the decedent's death and the date the will is funded. Under the clause [recommended in the article] the amount of the marital trust is determined and the executor will fund the trust with assets which equal its amount on the date it is funded.

"The disadvantage is that it can cause the estate income tax problems."

The author points out that if the executors use appreciated assets to satisfy the pecuniary bequest, the estate can incur a long-term capital gain.

surviving spouse and other beneficiaries depending upon the particular clause used."

N. A. Sugarman *'Pecuniary Formula' Marital Deduction Bequests: Application of Revenue Procedure 64–19*, 16 Western Reserve L.Rev. 257, 273 (1965).

The executors in this case have broad discretion with respect to the selection of the assets to fund the marital trust. The widow is the income beneficiary from this trust and was also a possible income beneficiary of the non-marital trust in the discretion of the trustee, prior to her remarriage after the death of the testator. With respect to the marital trust she was given a testamentary power of appointment over the residue by express reference to the power in her will.[5] In the event of her non-exercise of the power, the residue was to be added to the non-marital trust, except that the trustee was to discharge therefrom any enhanced death taxes incurred by the wife's estate as the result of the inclusion of the marital trust in her estate. The trustee was given a power of encroachment upon the corpus of the marital trust for the benefit of the widow. It was also given the power to sell assets and to invest and reinvest them.

Considering all of the terms of the will, we do not believe that the testator ever envisioned that any of the specific shares of stock which he held would necessarily be included in the marital trust or that such shares would be retained in the marital trust during the life of the widow or for any other particular period of time. Both the executors and the trustee (an independent banking institution) were given complete authority and discretion to sell and reinvest assets. The attempt, therefore, to require the executors to include specific shares of stock in the marital trust is diametrically contrary to the intention of the testator as expressed in his will.

While executors undoubtedly have a duty to deal fairly with all beneficiaries of a will, their primary duty is to carry out the will as written by the testator. This is the basic

source of their duties and of their powers. A bequest to the widow of a sum of money does not require the distribution of stock to her, nor does valuation at date of distribution mean the same thing as valuation at date of death if the executors fund a trust with assets other than cash. These executors could fund this marital trust with life insurance proceeds, other cash, interests in land or with any combination of the twelve corporate stock issues owned by the decedent. If the widow has a right, in law or equity, to require them to select any particular asset and to use date of death values, then the executors are thrown back into the very problems created by the 1964 Revenue Ruling and by T.C.A. § 30–1317 from which the testator planned to extricate them.

■ As to the second issue raised by the plaintiff, the date of funding of the trust, it is clear from the will that she was to be paid the income computed from the date of his death at convenient intervals, but at least quarterly during her life. This, however, does not mean that the executors were required to completely fund the trust within ninety days or within any other fixed period of time. *See, e. g.,* T.C.A. § 30–510 (allowing claims of creditors to be filed within six months of probate); *cf.* T.C.A. § 30–1313 (legatee may file for distribution after eighteen months). All of the beneficiaries of the will and the trustee have agreed upon an interim arrangement for the payment of income to the plaintiff, as to which no question is raised on appeal. The issue of the date of funding, therefore, is simply ancillary to the principal contention of the widow that she was entitled to specific shares of stock so that she might benefit from their post-death appreciation. Since there is no dissatisfaction with the method of computation or distribution of income on an interim basis, plaintiff has not shown any basis for a claim against the executors with respect to this issue.

■ The executors have filed a motion to consider post-judgment facts which is granted. T.R.A.P. 14. It appears from af-

5. *See First National Bank of McMinn County v. Walker*, 607 S.W.2d 469 (Tenn.1980).

fidavits which are not controverted that adversary proceedings are pending in the United States Tax Court pursuant to which the date of death value of the stock in question will be determined. This obviates the necessity of the Chancellor's holding a further hearing to determine that value, as ordered by the Court of Appeals. Until that issue is finally settled, the executors will not be able to compute the exact amount of the gross estate or to fund precisely either the marital or the non-marital trust. The Court of Appeals directed the executors to file an amended estate tax return. We find that action unwarranted and reverse the decision of the Court of Appeals in that respect.

In our opinion, the will of the testator is clear and unambiguous. The action brought by the widow, therefore, should be dismissed except for a simple declaration that the executors are required to follow its terms in the administration of the estate. Of course if the parties are not in agreement at the time of distribution as to the value of assets used for funding the marital trust or as to the accounting for income on an interim basis, such disputes can be settled by the probate court in the ordinary way.

Insofar as it held that the executors had discretion in the selection of assets for the funding of the marital trust, the judgment of the Court of Appeals is affirmed. Insofar as it directed the filing of an amended estate tax return, the judgment is reversed. The cause will be remanded to the trial court for entry of judgment consistent with this opinion and for any further orders which may be necessary. All costs incident to the cause will be taxed against the estate.

FONES, COOPER and BROCK, JJ., concur.

DROWOTA, J., dissents.

DROWOTA, Justice, dissenting.

I respectfully dissent.

Preliminarily, it seems helpful to explain as clearly as possible just why the plaintiff brought suit. As the majority opinion stated, the will provided that the widow would receive a set amount, a pecuniary amount. This amount will be set at one-half of the gross estate as determined by the Tax Court. The co-executors have the power, under the will, to decide which assets to distribute to the marital trust and *when* to distribute them. When the testator died, the co-executors knew that news of the merger involving Indiana Telephone Corporation would soon become public. The co-executors also knew that once the merger became public knowledge, the price of the stock would rise dramatically. The will provided that assets distributed to the marital trust would be valued at the date they were distributed. So if the co-executors knew which direction the price of an asset would move, they could affect its valuation by controlling the *timing* of the distribution of the asset. This is precisely what occurred in this case.

When the testator died the price of the Indiana Telephone stock was in the neighborhood of $35.00 per share. When news of the merger became public, the price went up, as the co-executors knew it would, to about $108.00 per share. As the majority opinion points out, the value of the testator's estate at his death approached one million dollars. Therefore, the widow's trust will be set at approximately $500,-000.00. Now, if the co-executors had distributed half of the stock to her trust before the merger became public knowledge, its "value" as defined by the will would have been approximately $107,000.00 ($35 \times \frac{1}{2} \times 6,123$ shares). Thus she would still be entitled to about $400,000.00 in additional assets. Since the executors waited until after the merger was announced, the "value" of the stock would be about $330,-000.00 ($108 \times \frac{1}{2} \times 6,123$ shares). Thus she would only be entitled to $170,000.00 additional assets. Another way of illustrating her injury is to note that if the co-executors had distributed half the stock to her trust prior to its dramatic jump in price, she would end up with assets in her trust worth about $730,000.00 (stock valued for the pur-

poses of the will at about $107,000.00 but now worth close to $330,000.00 plus $400,000.00 in additional assets). By delaying distribution, the co-executors insured that she could end up with no more than $500,000.00 and that the appreciation of the stock would only increase the size of their residuary trust. These figures are not exact but do illustrate graphically how the co-executors' delayed funding deprived the plaintiff from sharing in the appreciation of the stock. Since the trust for the benefit of the executors was a residual trust, they directly benefited from their failure to distribute any of the stock to her before the price went up.

An executor is held to the same degree of fidelity and diligence required of other trustees. *Baker v. Baker*, 24 Tenn.App. 220, 240, 142 S.W.2d 737, 750 (1940). A trustee owes a duty of loyalty to the beneficiary of the trust. Restatement (Second) of Trusts § 170 (1959). "One of the most fundamental duties of the trustee is that he must display throughout the administration of the trust complete loyalty to the interests of the beneficiary, and must exclude all selfish interests and all consideration of the interests of third persons." Bogert, Trusts & Trustees § 543 (1978). As applied to these facts, the co-executors' fiduciary duties required them to act on behalf of the widow as the beneficiary of Trust A and to act on behalf of themselves and their heirs as beneficiaries of the residuary trust. When the interests of the beneficiaries of the two trusts conflicted, they were under a duty to administer the estate in such a way as to be fair to the interests of both sets of beneficiaries.[1] The co-executors knew the merger would soon become public. They knew the price of the stock would dramatically increase. They knew that if they did not distribute any of the stock to the marital trust until it appreciated in value, they could deprive the widow of the benefit of the rise in price. They knew the effect of

this delay would be to increase the size of their residuary trust. They knew the assets of the estate other than the stock would be sufficient to pay creditors' claims, taxes, and administration expenses.[2] Instead of placing any of the stock in the marital trust so that plaintiff could share in the appreciation, they delayed distribution knowing that their inaction would be to their own benefit. In short, the co-executors acted solely in their own interest rather than in the interest of the beneficiary of the trust they were charged to administer. Whether their decision was intentional or not, in my judgment, it constituted a breach of their duty of loyalty. In order to be fair to the widow, they should have distributed half the stock to her trust before news of the merger became public.[3] In this way, both sets of beneficiaries would have benefited.

As I read the majority opinion, the conclusion drawn therein is based in part upon the fact that the will granted to the co-executors a great deal of discretion. Of course, if executors never exercised discretion, there would be no need for judicial review of their decisions. Fiduciary duties such as the duty of loyalty serve the purpose of insuring that when fiduciaries do exercise discretion, they exercise it on behalf of the beneficiary and not in their own self interest. This is true whether the beneficiary is rich or poor.

The majority opinion also indicates that the will and the circumstances surrounding its execution indicate that the testator would not have desired that the widow end up with any more than one half of the gross estate. In my judgment, the circumstances surrounding the execution of the will picture an extremely tax conscious businessman, who cared equally as much for his wife as he cared for his sons. It is equally plausible to assume that he would want his wife to get as much as she could receive *free from estate tax*. At this point I would note that early distribution of the stock to

1. None of the parties has asked this Court to remove the co-executors from their positions.

2. Only $19,000.00 in claims were filed against the estate.

3. It was at least three months after the testator's death that the merger was announced.

the marital trust would not increase the estate tax liability of this estate. There is no indication that the testator knew that he would die shortly before the merger was consummated. In fact, there is every indication that he believed he would see it through. If he had lived until the merger was completed, under this will the widow would get precisely what she requests in this lawsuit. It should also not be forgotten that the Chancellor held that the will envisioned funding of the trust within ninety days of the testator's death. While I agree with the majority that complete funding of the marital trust would be impossible to accomplish within ninety days, if it could have been accomplished that soon, this plaintiff would have shared in the appreciation of the stock unless the co-executors refused to place any of the stock in her trust. Therefore, I would have at least held that the will and the circumstances surrounding its execution do not indicate the testator's intent one way or another. This is a unique situation which the testator did not anticipate.

I, therefore, would have applied equitable principles to the co-executors' conduct and required them to place the widow in the same position which she would have been in if they had placed half the stock in her trust before the merger was announced.